1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


UNITED STATES OF AMERICA            )
                                    )
        v.                          )
                                    )            CASE NO.
JORDAN HARRIS,                      )   4:22-CR-00149-LGW-BWC-1
                                    )
_____Defendant._____ )



RULE 11 PROCEEDING
BEFORE THE HONORABLE LISA GODBEY WOOD
June 8, 2023; 10:32 a.m.
Brunswick, Georgia

APPEARANCES:

For the Government:         TANIA D. GROOVER, Esq.
                            U. S. Attorney's Office
                            P. O. Box 8970
                            Savannah, Georgia  31412
                            (912) 201-2552
                            tania.groover@usdoj.gov


For the Defendant:          SCOTT G. REDDOCK, Esq.
                            Law Office of Scott Reddock
                            111 West Court Street
                            Suite B
                            Hinesville, Georgia  31313
                            (912) 332-7077
                            reddgeg@aol.com


Reported by:                Debbie Gilbert, RPR, CCR
                            Official Court Reporter
                            801 Gloucester Street
                            Post Office Box 1894
                            Brunswick, GA 31521-1894
                            (912) 262-2608 or (912) 266-6006
                            debra_gilbert@gas.uscourts.gov
                            - - -

2

1                      P R O C E E D I N G S

2              (Call to order at 10:31 a.m.)

3         THE COURT:  Ms. Sharp, call the next case.

4         THE CLERK:  United States of America versus Jordan

5   Harris, Tania Groover for the Government, Scott Reddock for the

6   defense.

7         MS. GROOVER:  Good morning, Your Honor, the United

8   States is ready to proceed.

9         MR. REDDOCK:  Ready to proceed, Your Honor.

10        THE COURT:  Mr. Reddock, approach with your client, Mr.

11  Jordan Harris.

12        Mr. Harris, here we are because the United States

13  Attorney and your own attorney say you want to change your plea

14  from not guilty to guilty to one of the counts that's pending

15  against you in this multi-count federal felony criminal

16  indictment; is that correct?

17        THE DEFENDANT:  Yes, Your Honor.

18        THE COURT:  The purpose of this proceeding is going to

19  be for me to make sure you understand the indictment as it's

20  presently pending against you.  I want to make sure you

21  understand all the rights that you waive or give up if I decide

22  to accept your plea.

23        I also want to make sure there's, in fact, a factual

24  basis for a plea of guilty to that one count and that this is

25  really what you want to do.  There will be other things that we

3

1    take up as we go along.  I just want you to know right from the

2    beginning this is an important step in your life.  It's not

3    something to take lightly; understand?

4         THE DEFENDANT:  Yes, Your Honor.

5         THE COURT:  Also know in just a moment I'm going to have

6    you put under oath, sworn to tell the truth.  If you don't tell

7    the truth while under oath, the Government could prosecute you

8    for perjury; understand?

9         THE DEFENDANT:  Yes, Your Honor.

10        THE COURT:  Now, is anybody making you, pushing you,

11   leaning on you to come in here and plead guilty?

12        THE DEFENDANT:  No, Your Honor.

13        THE COURT:  This is what you want to do.

14        THE DEFENDANT:  Yes.

15        THE COURT:  Swear in Mr. Harris.

16                         JORDAN HARRIS,

17   having been first duly sworn, was examined and testified as

18   follows:

19        THE CLERK:  Thank you.  If you will please state your

20   full name and spell your last name.

21        THE DEFENDANT:  Jordan William Harris and my last name

22   is H-a-r-r-i-s.

23        THE COURT:  And Mr. Harris, what are the last four

24   digits in your social security number?

25        THE DEFENDANT:  1932.

4

1          THE COURT:  How old are you?

2          THE DEFENDANT:  25.

3          THE COURT:  25?

4          THE DEFENDANT:  (Nods head).

5          THE COURT:  Are you married?

6          THE DEFENDANT:  No, ma'am.

7          THE COURT:  Do you have any children?

8          THE DEFENDANT:  No, ma'am.

9          THE COURT:  Where were you born?

10          THE DEFENDANT:  I was born in LaGuardia Hospital.

11  That's in -- that's in Queens, New York.

12          THE COURT:  It's in where.

13          THE DEFENDANT:  Queens, New York.

14          THE COURT:  In Queens, New York?

15          THE DEFENDANT:  (Nods head).

16          THE COURT:  And at the time of this arrest, where were

17  you living?

18          THE DEFENDANT:  I was in New Jersey on job corps campus.

19          THE COURT:  Where in New Jersey?

20          THE DEFENDANT:  Addison, New Jersey, ma'am.

21          THE COURT:  Tell me about your educational background.

22  How far did you go in school?

23          THE DEFENDANT:  High school.

24          THE COURT:  Did you graduate?

25          THE DEFENDANT:  Yes, ma'am.

5

1          THE COURT:  What year was that?

2          THE DEFENDANT:  Just like recently.  I dropped out.  I

3    had dropped out -- I had dropped out of my original high school,

4    William Cullen Bryant, when I was like 16, and I signed up in

5    the job corps when I was like 21 or 22, and then I graduated

6    recently when I was 24.

7          THE COURT:  Which high school did you graduate from?

8          THE DEFENDANT:  It's in job corps.

9          THE COURT:  Okay.  And what year would that graduation

10   be?

11         THE DEFENDANT:  2021.

12         THE COURT:  Tell me about your work history.  What jobs

13   have you maintained?

14         THE DEFENDANT:  I used to work for the parks department

15   and I used to work this other marketing job that has to do with

16   like electrical.  What is it?  Oh, yeah, Green Energy, Green

17   Energy, Green Energy Company.

18         THE COURT:  Going back to the parts department, what

19   kind of parts were these?

20         THE DEFENDANT:  Oh, you know, we just had to clean the

21   park areas like basically used to be park ranger.

22         THE COURT:  Oh, I see, park.  You were sort of like a

23   park ranger?

24         THE DEFENDANT:  I was a park ranger.

25         THE COURT:  And where was the park that you worked at,

6

1    or parks?

2         THE DEFENDANT:  In New York, around Jamaica, New York.

3         THE COURT:  Were they state parks or county parks?

4         THE DEFENDANT:  They were -- well, I guess you could say

5    state parks, but ... we don't really -- New York doesn't really

6    go by counties.

7         THE COURT:  I'm trying to visualize, is it the kind of

8    thing you wore like a uniform?

9         THE DEFENDANT:  Yes.

10        THE COURT:  And what were some of your job duties?

11        THE DEFENDANT:  Just to clean up the park like, like

12   pick up trash, like litter that's in the park, things like that.

13        THE COURT:  And then the other job that you mentioned

14   with Green Energy, you were doing marketing with that?

15        THE DEFENDANT:  Yes.  We had to get people to sign for

16   Green Energy, like basically if you live in a house or whatever

17   like you're signing to basically -- instead of supplying

18   dirty -- I don't know how to explain because I was young at the

19   time.  I was like 19 or 20, but instead of signing up -- well,

20   you have to sign up for Green Energy Electric Company.  It's an

21   electric company.  It's hard to explain.

22        THE COURT:  Would your role be, were you on the phone or

23   were you physically going to people?

24        THE DEFENDANT:  No, we had to go and knock on people's

25   doors.

7

1      THE COURT:  I see, you went door to door?

2      THE DEFENDANT:  Yes.

3      THE COURT:  Have you ever been diagnosed with any mental

4  or physical disability?

5      THE DEFENDANT:  Not that I know of, no.

6      THE COURT:  Do you take any medications?

7      THE DEFENDANT:  No.

8      THE COURT:  And in the last two days, have you had any

9  drugs or alcohol?

10      THE DEFENDANT:  No.

11      THE COURT:  All right, Mr. Harris, as you stand before

12  me right now, you're presumed innocent.  What that means is the

13  Government is your accuser, and as such, they have to prove that

14  you're guilty and they have got to do that by bringing forth

15  proof of guilt beyond a reasonable doubt.  You as the defendant

16  don't have to prove anything; understand?

17      THE DEFENDANT:  Yes, ma'am.

18      THE COURT:  Also know the indictment that was filed

19  against you, the document that sets forth the charges, that's

20  not evidence.  That's simply what the grand jury and the US

21  Attorney accuse you of having done but it's not evidence;

22  understand?

23      THE DEFENDANT:  Yes, ma'am.

24      THE COURT:  Now, Mr. Reddock, are you appointed or

25  retained?

8

1          MR. REDDOCK:  Appointed, Your Honor.

2          THE COURT:  That means you've explained you didn't have

3     the kind of money to pay an attorney, and so Mr. Reddock was

4     appointed to represent you at no charge to you; is that right?

5          THE DEFENDANT:  Yes.

6          THE COURT:  I want you to know you have the right to his

7     representation at no charge to you throughout this and every

8     other phase of your case; understand?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Also know you don't have to plead guilty.

11    If you want to persist in a plea of not guilty you're entitled

12    to do that.

13         If you were to persist in a plea of not guilty, you'd be

14    entitled to a public and speedy trial by jury.  During the jury

15    trial a number of rights would belong to you.  The presumption

16    of innocence that we talked about, that would follow you

17    throughout the trial.  Your right to Mr. Reddock's

18    representation at no charge to you would follow you throughout

19    the trial.

20         You'd have the right to see, hear, confront and

21    cross-examine any witness the Government might call.  You'd have

22    the right to see all their evidence.  For your own part, you'd

23    have the right to put up evidence if you wanted.  You'd have the

24    right to call witnesses and use subpoenas from the court to make

25    them appear.

1          You'd have the right to take the stand and testify,

2     subject yourself to cross-examination by the US Attorney, but

3     you would also have the right to go to trial and remain silent

4     and if you elected to proceed in that fashion, nobody could say

5     anything negative about your silence in front of the jury.  It

6     is after all a constitutional right; understand?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Do you have any questions about that?

9          THE DEFENDANT:  No, Your Honor.

10          THE COURT:  Do you understand that if you plead guilty

11     and I decide to accept your plea, you will have waived, that is,

12     given up all the rights associated with a trial by jury.  In

13     fact, there will be no trial of any kind.  Essentially what will

14     remain of your case is the sentencing phase; understand?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Well, have you and Mr. Reddock had the

17     opportunity to talk about the facts and the law as they pertain

18     to your case?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  Has he gone over with you the indictment

21     that was filed against you?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  Has he gone over with you this plea

24     agreement you're proposing?

25          THE DEFENDANT:  Yes, Your Honor.

10

1        THE COURT:  Are you satisfied with his representation?

2        THE DEFENDANT:  Yes.

3        THE COURT:  Do you have any complaints about it

4    whatsoever?

5        THE DEFENDANT:  No.

6        THE COURT:  Has he gone over, at least in general terms,

7    the sentencing guidelines with you?

8        THE DEFENDANT:  Yes, Your Honor.

9        THE COURT:  I understand that you and Mr. Reddock have

10   gone over the indictment together, but it's my obligation to

11   cover it with you as a part of this proceeding.  As I said at

12   the outset, it's a multi-count federal felony criminal

13   indictment.

14       I understand you're here offering to plead guilty only

15   to Count 1.  Let me begin there.  Count 1 alleges a violation of

16   18 USC Section 2422(b), that is, coercion and enticement of a

17   minor to engage in sexual activity.

18       Specifically, it alleges that between on or about

19   November 25th of 2021 and October 3rd, 2022 in Chatham County,

20   which is within the Southern District of Georgia, and elsewhere,

21   it alleges that you used facilities of interstate and foreign

22   commerce, namely, cell phones and the Internet, to knowingly

23   persuade, induce, entice and coerce a person identified in the

24   indictment as Jane Doe Number 1, who it alleges had not yet

25   attained the age of 18 years old, to engage in sexual activity

1   for which a person can be charged with an offense under the laws

2   of the state of Georgia, that is, the crime of child molestation

3   in violation of the Official Code of Georgia Section 16-6-4, all

4   done, it alleges, in violation of 18 USC Section 2422(b).

5          You're also charged in Count 2 with travel with the

6   intent to engage in illicit sexual conduct in violation of 18

7   USC Section 2423(b).  It's my understanding you are not offering

8   to plead guilty to Count 2.

9          And you're charged in Count 3 with transportation with

10  intent to engage in a criminal sexual activity in violation of

11  18 USC Section 2423(a).  It's my understanding you are not

12  offering to plead guilty to Count 3.

13         There is a forfeiture allegation in the indictment

14  through which the United States seeks forfeiture of certain

15  property used in connection with the offense.  And my question

16  to you after all of that is simply:  Do you understand that's

17  what's set forth against you in this indictment?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Now, in order to convict you of that one

20  count to which you're offering to plead guilty, Count 1, the

21  Government would have to prove beyond a reasonable doubt what

22  are called the essential elements of that offense, and the

23  essential elements of that particular offense are four-fold, so

24  the Government would have to prove these four things:  First,

25  that you knowingly persuaded, induced, enticed or coerced Jane

1  Doe Number 1 to engage in sexual activity as charged; second,

2  that you used a cell phone and the Internet to do so; third,

3  that when you did those things, Jane Doe Number 1 was under 18

4  years old; and finally that one or more individuals engaging in

5  the sexual activity could have been charged with a criminal

6  offense under the law of the State of Georgia.

7         Do you understand those are the essential elements of

8  that offense?

9         THE DEFENDANT:  Yes, Your Honor.

10        THE COURT:  And do you understand that by pleading

11 guilty you admit that they are satisfied?

12        THE DEFENDANT:  Yes.

13        THE COURT:  Now, the maximum possible penalty that I

14 could ever impose for Count 1 is imprisonment of not less than

15 ten years and up to life, a fine of not more than $250,000.00, a

16 term of supervised release of not less than five years nor more

17 than life, a $100.00 special assessment, a second special

18 assessment of $5,000.00 and restitution in an amount to be

19 determined by me that would be payable to victims.

20        Do you understand those are the maximum possible

21 penalties that could be imposed?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  I do want you to understand that Count 1,

24 the count to which you're offering to plead guilty, has what's

25 called a minimum mandatory punishment.  That is, if you plead

13

1   guilty to Count 1 and I decide to accept your plea of guilty, I

2   must sentence you at least ten years in prison; do you

3   understand?

4        THE DEFENDANT:  Yes, Your Honor.

5        THE COURT:  Do you have any questions about those

6   penalties?

7        THE DEFENDANT:  No.

8        THE COURT:  A few followup concepts about punishment.

9   That phrase "supervised release" means once you're released from

10  prison you will have to follow the rules that I set forth for a

11  given number of years.  Those rules may include but not be

12  limited to a requirement that you get a job, that you not

13  violate any laws.

14       You may be subject to certain searches as directed by

15  Probation.  You may be limited in your ability to contact people

16  under the age of 18 years old.

17       You may be required to register as a sex offender, and

18  if you were to fail to live up to the terms of supervised

19  release, you could wind up back in prison.  Do you understand?

20       THE DEFENDANT:  Yes, Your Honor.

21       THE COURT:  Do you have any questions about that?

22       THE DEFENDANT:  No, Your Honor.

23       THE COURT:  I also want you to be familiar at least in

24  general terms with the federal sentencing guidelines.  Those

25  guidelines are not mandatory.  They are advisory but it's still

14

1   my duty to calculate what the advisory guideline range is going

2   to be in your case and to consider that range along with

3   possible departures under the guidelines themselves, then to

4   also consider all the sentencing factors that are set forth in

5   our federal sentencing statute, 18 USC Section 3553.

6           Once I consider all those things, it's going to result

7   in me imposing a punishment on you that's either within that

8   advisory guideline range or it could be below it; it could be

9   above it.

10          Now some of the major factors that go into figuring all

11  that out is your criminal history or lack thereof, your role in

12  the offense, what it was you did, and whether you came here and

13  told the truth and accepted responsibility for your actions.

14  Those are some of the major factors that go into it.  There's

15  others.

16          Do you understand all of that?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Do you have any questions about any of it?

19          THE DEFENDANT:  No.

20          THE COURT:  Has anybody promised you an exact sentence?

21          THE DEFENDANT:  Promised me an exact sentence?  No.

22          THE COURT:  That's good.  At this point all they can do

23  is give you their best guess and their guess wouldn't be binding

24  on me as your sentencing judge; understand?

25          THE DEFENDANT:  Yes, ma'am.

1    THE COURT:  Well, in representing you, Mr. Reddock has

2   negotiated apparently with the US Attorney's Office trying to

3   reach a plea agreement in your case.  Did he have your

4   permission to do that?

5    THE DEFENDANT:  Yes, ma'am.

6    THE COURT:  We will take up that agreement.  Ms.

7   Groover, if you will stand and summarize the provisions of that

8   plea agreement.

9    MS. GROOVER:  Thank you, Your Honor.

10    We have reached a plea agreement in this case that calls

11   for the defendant pleading guilty to Count 1 of the indictment.

12   At sentencing, the Government will move to dismiss any other

13   counts in the indictment that remain pending against the

14   defendant.

15    The Government agrees it will not file additional

16   federal charges relating to Defendant's conduct concerning

17   identified minors, Victims Number 2 through 8, identified from a

18   search of the defendant's iPhone 7-plus cell phone bearing the

19   serial number that is identified in the plea agreement.

20    And the Government does reserve the right to use

21   Defendant's conduct concerning these identified minors Number 2

22   through 8 at sentencing.

23    THE COURT:  When you say to use the conduct regarding

24   Victims 2 through 8 at sentencing, you mean you are reserving

25   the right to use that as relevant conduct that could result in

1    an increase in the sentencing guidelines otherwise calculated

2    based on Victim 1 alone?

3            MS. GROOVER:  That is correct, Your Honor.

4            THE COURT:  Proceed.

5            MS. GROOVER:  The Government also agrees to recommend to

6    the district attorney's office for the Eastern Judicial Circuit

7    of Georgia that it not file additional state charges related to

8    Defendant's conduct in the indictment.

9            If The Court determines Defendant qualifies for an

10   adjustment under Section 3E1.1(a) and his offense level prior to

11   that adjustment is 16 or greater, the Government will move for

12   an additional one-level reduction in offense level.

13           Defendant also agrees to pay restitution for the full

14   loss caused by his total criminal conduct which is not limited

15   to the specific counts that he is pleading guilty, including

16   restitution relating to Jane Doe Number 1 in the indictment and

17   Minor Victims Number 2 through 8 identified from the search of

18   his cell phone.

19           Defendant agrees to abandon his interest in the cell

20   phone used in this particular case.  Defendant also waives his

21   right to appeal on any ground with only three exceptions that

22   are outlined in the plea agreement and that by signing the plea

23   agreement Defendant explicitly instructs his attorney not to

24   file an appeal unless one of the three exceptions is met.

25           Defendant entirely waives his right to collaterally

17

1    attack his conviction and sentence on any ground and by any

2    method including but not limited to a Title 27 United States

3    Code Section 2255 motion, and the only exception is that

4    Defendant may collaterally attack his conviction and sentence

5    based on a claim of ineffective assistance of counsel.

6         But it also waives the rights to request all information

7    about the investigation and prosecution of his case under the

8    Freedom of Information Act or the Privacy Act, and finally he

9    waives the protections of Rule 11(f) of the Federal Rules of

10   Criminal Procedure and Rule 410 of the Federal Rules of

11   Evidence.

12        If he fails to plead guilty or later withdraws his

13   guilty plea, all statements made by him in connection with that

14   shall be admissible for any and all purposes.

15        This is a summary of the plea agreement that we have

16   reached, Your Honor.  The plea agreement document itself is nine

17   pages.  On Page 8 bears my signature as well as Patricia Rhodes'

18   signature on behalf of the United States.

19        Would you like me to verify the remaining signatures?

20        THE COURT:  Yes, thank you.

21        MS. GROOVER:  Mr. Reddock, is this your signature on

22   Page 9 of the plea agreement?

23        MR. REDDOCK:  It is.

24        MS. GROOVER:  Mr. Harris, is this your signature on Page

25   9 of the plea agreement?

1          THE DEFENDANT:  Yes, ma'am.

2          MS. GROOVER:  Your Honor, this is the plea agreement

3   that we have reached that we submit to you for consideration.

4          THE COURT:  All right, thank you.  Mr. Reddock, is that

5   summary consistent with the agreement you negotiated?

6          MR. REDDOCK:  It is, Your Honor.

7          THE COURT:  Mr. Harris, is that summary consistent with

8   the agreement that you signed?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  And did you read it before you signed it?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Other than the provisions contained in that

13   plea agreement, has anybody made you any promises about the

14   outcome of your case?

15         THE DEFENDANT:  No.

16         THE COURT:  I do want to pick back up on one of the

17   points that Ms. Groover made, and that is contained in the plea

18   agreement you're proposing is a waiver of certain appeal rights.

19   It states, "Defendant entirely waives his right to a direct

20   appeal of his conviction and sentence on any ground."

21         Now, there are, however, three exceptions to that

22   waiver.  That means if but only if one of these three things

23   were to occur would you get a direct appeal right pursuant to

24   this agreement.  Number 1, if I sentence you above the statutory

25   maximum, you could appeal that directly.  Number 2, if I

19

1  sentence you above the advisory guideline range as found by me,

2  you could appeal that directly.  Or Number 3, if the Government

3  were to file a direct appeal, then you could file one as well.

4       Otherwise, pursuant to this plea agreement you waive all

5  other direct appeal rights; understand?

6       THE DEFENDANT:  Yes, Your Honor.

7       THE COURT:  Any questions about that waiver?

8       THE DEFENDANT:  No, Your Honor.

9       THE COURT:  Also contained in the agreement is a waiver

10  of certain collateral attack rights.  It states, "Defendant

11  entirely waives his right to collaterally attack Defendant's

12  conviction and sentence on any ground and by any method

13  including but not limited to a 28 USC Section 2255 motion."

14       There is an exception to that waiver, and that is

15  pursuant to this agreement, you retain the right to collaterally

16  attack based on a claim of ineffective assistance of counsel.

17  Otherwise, pursuant to this plea agreement, you waive all other

18  collateral attack rights; understand?

19       THE DEFENDANT:  Yes, Your Honor.

20       THE COURT:  Any questions about that waiver?

21       THE DEFENDANT:  No.

22       THE COURT:  Well, Mr. Reddock, as an officer of The

23  Court, are you aware of any impropriety on the part of the

24  Government in handling Mr. Harris' case?

25       MR. REDDOCK:  No, Your Honor.

20

1          THE COURT:  And Ms. Groover, are you aware of any

2     impropriety on anyone's part in handling this case?

3          MS. GROOVER:  No, Your Honor.

4          THE COURT:  Mr. Harris, do you still want to plead

5     guilty to Count 1?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Do you want to plead guilty to Count 1

8     because you are, in fact, guilty of it?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Do you understand the rights and the

11     privileges that you waive or give up if I accept your plea?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  Let the record reflect that Mr. Jordan

14     Harris is 25.  He's not married.  He has no children.  He was

15     born in Queens, New York and was living in New Jersey at the

16     time of this arrest.

17          He graduated from high school and has worked in parks as

18     essentially like a ranger.  He also has worked in marketing in

19     the green energy field.  He's not laboring under any

20     disabilities, doesn't take any medications.  He's not under the

21     influence of any drugs or alcohol.  I've watched him as he's

22     interacted in court with me this morning.  It's clear he's in

23     full possession of all his faculties.

24          He's had the services of an excellent defense lawyer who

25     has gone over all the requisite pleadings and concepts with him.

21

1  In short, I find that Mr. Harris' offer to plead guilty to Count

2  1 is knowing.  I also find that it's voluntary; is that correct,

3  Mr. Harris?

4       THE DEFENDANT:  Yes, Your Honor.

5       THE COURT:  Therefore, I will approve of the plea

6  agreement.  Let me call on Ms. Groover for a factual basis and

7  you two may have a seat while she does so.

8       MS. GROOVER:  Thank you, Your Honor.  The United States

9  calls Special Agent Hillary Nielsen to the stand.

10               SPECIAL AGENT HILLARY NIELSEN,

11  having been first duly sworn, was examined and testified as

12  follows:

13       THE CLERK:  Thank you.  If you will please state your

14  full name, spell your last, state your occupation and your

15  business address.

16       THE WITNESS:  Hillary Nielsen.  My last name is

17  N-i-e-l-s-e-n.  I'm employed as a special agent with Homeland

18  Security Investigations.  My office is located at 2 East Bryan

19  Street, B-r-y-a-n, Suite 800, Savannah, Georgia 31401.

20                     EXAMINATION

21  BY MS. GROOVER:

22  Q.   How long have you been working as a special agent with

23  Homeland Security?

24  A.   I've been with Homeland Security Investigations since

25  2020.

22

1   Q.    And are you familiar with the case involving Mr. Jordan

2   Harris?

3   A.    I am.

4   Q.    Prior to your employment with Homeland Security, how were

5   you employed?

6   A.    I worked for Savannah Police Department from 2011 until

7   2020.

8   Q.    And in what capacity did you work in Savannah Police

9   Department?

10  A.    I started on patrol.  I held varying position over the

11  years, and I spent my final years in investigations.

12  Specifically I was assigned to the special victims unit

13  investigating sex crimes against adults and children.

14  Q.    And did you begin an investigation or became familiar with

15  the investigation concerning Jordan Harris while you were

16  employed as a detective in the Savannah Police Department?

17  A.    I believe I was first notified of the case after I had

18  made the switch over to HSI.  I was notified by Garden City

19  Police Department.

20  Q.    And how did this case begin?

21  A.    Garden City Police Department initially received a report

22  of a missing juvenile in December of 2021.  They conducted some

23  initial investigative steps and then notified me, and we

24  partnered on the investigation moving forward.

25  Q.    And exactly did the mother call 911 and explain that her

1    15-year-old daughter was missing?

2    A.    She did, on December 23rd, 2021.

3    Q.    And did she explain she wasn't home at the time, but her

4    other children were and that they had heard a knock on the door

5    and the 15-year-old daughter grabbed a bag and left?

6    A.    That's correct.

7    Q.    A few days later on December the 27th of 2021, did the

8    mother call Garden City Police Department back and explain that

9    she had found her daughter?

10   A.    She did.

11   Q.    Did she explain she found her daughter in New York?

12   A.    She did.

13   Q.    And drove to pick her up?

14   A.    She did.

15   Q.    Did this investigation reveal that the victim, this

16   15-year-old daughter who went missing, met the defendant on an

17   application called BandLab?

18   A.    Yes.

19   Q.    Can you tell the Judge, The Court what BandLab is?

20   A.    BandLab is a mobile application.  It's used for social

21   networking but primarily for musician who want to post audio or

22   video clips of their music, but it also has some friend, photo

23   and chat features where you can meet other individuals and

24   communicate one on one in private messaging.

25   Q.    Did the investigation revealed that the victim had an

24

1   account as well as Mr. Harris?

2   A.   Yes, that's correct.

3   Q.   And that the victim had posted a music video on BandLab.

4   The defendant liked the video and the two started talking

5   through the application?

6   A.   That's correct.

7   Q.   And at the time when that began, did the victim, is she

8   identified as Jane Doe Number 1 in the indictment?

9   A.   She is.

10  Q.   Did she live in Garden City in Chatham County here in the

11  Southern District of Georgia?

12  A.   That's correct.

13  Q.   At the time they began communicating, was the defendant

14  located in the New Jersey or New York area?

15  A.   Yes.

16  Q.   And did those communications begin on or about November

17  25th of 2021?

18  A.   Their communications -- she went missing December 23rd,

19  2021.  She communicated for approximately a full year prior to

20  that.

21  Q.   Okay.  And at some point, did their conversations turn

22  sexual?

23  A.   Yes, they did.

24  Q.   And did Mr. Harris send images of his penis to Jane Doe

25  Number 1?

1   A.   Yes, multiple times.

2   Q.   And did they also use an app called Triller app?

3   A.   Yes.

4   Q.   Triller spelled T-r-i-l-l-e-r?

5   A.   Yes.

6   Q.   Can you explain to The Court what Triller is?

7   A.   It is a chat application used often in lieu of a phone

8   number because it can be operated on wi-fi only, and it allows

9   individuals to communicate one on one via text messaging.

10   Q.   And while the two were communicating on BandLab and then

11   Triller, did ultimately the two plan a trip for Mr. Harris to

12   go, travel from the New York/New Jersey area and travel to

13   Savannah to pick up the victim and take her back to his home in

14   New York?

15   A.   That's correct.

16   Q.   And did the investigation reveal that Mr. Harris purchased

17   a Greyhound bus ticket and picked up the 15-year-old child and

18   then the two of them traveled again by Greyhound bus back to New

19   York?

20   A.   That's correct.

21   Q.   And along the way, did the defendant, Mr. Harris, explain

22   to the child what she should be doing with her cell phone?

23   A.   Yes.

24   Q.   Can you please tell The Court exactly what he explained to

25   her?

26

1   A.    So during their bus ride back, he told her that he was

2   concerned that they were being tracked, so that she needed to

3   take the SIM card out of her phone and out of his phone and

4   break them and throw them away at one of the bus stops.

5   Q.    And did the investigation -- were you able to corroborate

6   the investigation that the bus rides, there were records from

7   Greyhound as well as surveillance videos as well as phone

8   records from the victim's phone?

9   A.    Yes, I was.

10  Q.    And while on this trip, in fact, from Savannah up to the

11  New York area, did the defendant and the victim engaged in

12  sexual conduct?

13  A.    Yes.

14  Q.    To include oral sex?

15  A.    Correct.

16  Q.    Were you able to confirm that from the BandLab

17  communications?

18  A.    I was, and from Mr. Harris' interview.

19  Q.    And at first was Jane Doe Number 1 interviewed about her

20  conduct with the defendant?

21  A.    She was.

22  Q.    And at first, did she deny any kind of sexual

23  communication or conduct?

24  A.    She did not initially disclose the sexual acts, that's

25  correct.

27

1   Q.   Did she later admit that she was asked to perform oral sex

2   on Mr. Harris?

3   A.   Yes, and he also stated that he had tried to have sex with

4   her.

5   Q.   Can you also explain to The Court how the victim's mother

6   was able to locate the missing child in New York?

7   A.   Sure.  So a few days after the child had gone missing, the

8   victim's mother actually received a phone call from Mr. Harris'

9   mother.  Mr. Harris had brought the victim to his mother's home,

10   tried to pass her off as a family member on his father's side of

11   the family.

12       The mother realized something was off and eventually

13   figured out who the child was and called the child's mother to

14   tell the mother where the child was.  Provided -- Jordan Harris'

15   mother provided the child's mother with her address, and the

16   child's mother drove through the night to get up to New York to

17   get her daughter.

18   Q.   Once the victim was back home with her mother, she -- the

19   victim was then interviewed by law enforcement, and did law

20   enforcement also receive her cell phone?

21   A.   Yes, we did.

22   Q.   And did the mother consent to a search of her cell phone?

23   A.   Yes.

24   Q.   Did law enforcement determine that after the victim was

25   home, Mr. Harris continued to communicate with this child even

1   after she had returned home with her mother?

2   A.   That's correct, he did.

3   Q.   And that these communications were through BandLab again?

4   A.   Yes.

5   Q.   Did the mother and the 15-year-old give law enforcement

6   permission to take over the control of the BandLab account and

7   continue communicating undercover with Mr. Harris?

8   A.   Yes, they did.

9   Q.   So did the undercover communications between law

10  enforcement and Mr. Harris occur between approximately January

11  21st of 2022 and at least October the 3rd of 2022?

12  A.   Yes.  They would have begun in January with the account

13  takeover and then continued until he arrived back in Savannah on

14  November 18th of 2022.

15  Q.   And while law enforcement used the victim's account, did

16  law enforcement pretend to actually be the 15-year-old child?

17  A.   Yes.

18  Q.   And was one purpose of that to try to bring Mr. Harris

19  back to Savannah to arrest him?

20  A.   Correct.

21  Q.   Was another purpose to determine if there were any other

22  minors involved in this particular case?

23  A.   That is correct.  The victim had said that she saw

24  communications and imagery on his phone of who she believed to

25  be other minors so we were attempting to identify them.

1  Q.   And during the undercover communications, did Mr. Harris

2  make references to his trip to Garden City previously when he

3  picked up the minor?

4  A.   He did.

5  Q.   Did he also make references to discarding the SIM cards

6  from the phone?

7  A.   Yes, he did.

8  Q.   Did he also explain about being in New York with the

9  victim?

10  A.   Yes.

11  Q.   And did he also discuss the actual sexual acts that

12  occurred with this 15-year-old child?

13  A.   Yes.  He discussed some of them via the text messages in

14  BandLab and some of them during his interview.

15  Q.   And did he express an interest in returning back to the

16  Garden City/Savannah area to meet back up with this 15-year-old

17  child to continue their sexual relationship?

18  A.   Yes, he did.

19  Q.   Did the investigation reveal that the communications as

20  well as the conduct constitute a violation of child molestation

21  pursuant to Georgia Official Code 16-6-4?

22  A.   Yes.

23  Q.   And at some point, did the defendant, in fact, leave the

24  New York/New Jersey area and come back to Savannah to try to

25  meet up with the victim, the 15-year-old child, and continue the

30

1   sexual relationship?

2   A.    That's correct.

3   Q.    And was law enforcement prepared to arrest him at that

4   time?

5   A.    Yes.

6   Q.    And after his -- was he arrested?

7   A.    He was on November 18th of 2022 in Garden City.

8   Q.    And following his arrest, did law enforcement obtain a

9   search warrant and search his phone?

10  A.    Yes.

11  Q.    And did law enforcement also speak with Mr. Harris and

12  interview him?

13  A.    Yes.

14  Q.    Prior to speaking to him, was he advised of his Miranda

15  rights?

16  A.    He was.

17  Q.    Did he agree to waive his rights and speak with law

18  enforcement?

19  A.    Yes.

20  Q.    What, in general, did he tell you about this 15-year-old

21  child?

22  A.    He described the first trip to Savannah in December 2021,

23  said that he was aware of her age, that on their trip back up to

24  New York that he kissed her on the lips.  He licked her bare

25  chest between her breasts, that he used his finger to vaginally

1   penetrate her, that she used her hand to touch his penis and

2   that he told her to pull his pants down, take his penis out and

3   put her mouth on his penis to perform oral sex.  He also said

4   that he used his penis to slightly penetrate her vaginally.

5        He discussed the breaking the SIM cards, discarding the

6   SIM cards and then discussed their ongoing communications after

7   she had returned home and that his plans for the second trip to

8   Savannah were also sexual.

9        He was read some -- some quotations and excerpts from the

10  communications where he said he was going to be aggressive, that

11  he was going to rape the child, that he was going to molest the

12  child and so we discussed those in the interview as well.  He

13  said that he --

14       THE COURT:  Those were communications to her?

15       THE WITNESS:  When the -- to her but when the account

16  was in our custody so he was actually speaking with the

17  undercover but discussing his plans for the second trip to the

18  Savannah area.

19       He estimated that he had sent about 50 images of his

20  penis to her and said that he had also asked her on multiple

21  occasions to send naked images of herself to him.

22       MS. GROOVER:  Thank you.  Those are all the questions I

23  have, Your Honor.

24       THE COURT:  As to Victims 2 through 8, what materialized

25  with regard to those victims?

1          THE WITNESS:  So I asked Mr. Harris in the interview if

2     he had spoke to other minors in the same fashion he met online.

3     He said he had.  Through a forensic examination of his phone, we

4     were able to identify additional minors that he's had those

5     communications with.

6          We have confirmed identities on four of those and victim

7     identification efforts for the remainder is still ongoing.  I'm

8     awaiting some response on legal process and things like that.

9          Some of those children have confirmed that they had

10    conversations that were sexually explicit in nature, that at the

11    direction of Mr. Harris that they had produced sexually explicit

12    imagery, whether it was via a live stream video recording and

13    imagery that they produced and sent to him.

14         One of the children said that Mr. Harris threatened to

15    kill them if they didn't produce the imagery, and so we were

16    able to identify those four.  One of them he actually continued

17    communicating with after his arrest from his jail calls, and

18    we're still trying to identify the remainder.

19         THE COURT:  All right, thank you.  Mr. Reddock, any

20    cross-examination?

21                          EXAMINATION

22     BY MR. REDDOCK:

23    Q.    Yes, Your Honor, briefly.

24          Good morning, Agent Nielsen.

25    A.    Good morning.

1   Q.   I had some points of clarification.  You mentioned that

2   during the forensic interview of the minor victim, the minor

3   victim stated that Mr. Harris attempted to have sex with her.

4   Did she also state that she told Mr. Harris no?

5   A.   I believe so and that she tried to push him off of her, I

6   believe, during her second forensic interview.

7   Q.   And did she also state once she said no he desisted from

8   that attempt to have sex with her?

9   A.   That's correct.

10  Q.   Also as far as his messages to the minor victim, Jane Doe

11  in this case, and Minor Victims 2 through 8, were his messages,

12  would you describe them as hyperbolic as far as the -- what you

13  described as aggressive tone?

14  A.   Are you -- would you mind rewording it so I make sure I'm

15  clear on which ones you're referring?

16  Q.   Did any of the minor victims that law enforcement has

17  spoken to, have any of them indicated that they were ever

18  actually -- felt threatened by Mr. Harris?

19  A.   Yes.

20  Q.   Which minor victim was that?

21  A.   I believe Minor Victim 7 is the one I'm thinking of.  She

22  said that she was -- that he demanded that she share her

23  location with him on Snapchat I believe it was and that he

24  also -- that's the victim that he threatened to kill if she

25  didn't send nude images of herself, so she did say that she was

34

1    afraid.

2    Q.   And during your interview with Mr. Harris, how did he

3    describe those types of messages?

4    A.   So I didn't ask him about Minor Victim 7 because we didn't

5    find those message until we examined his phone after his

6    interview.  You might be referring to the quotes that I was

7    reading from earlier when he was using the words like "rape" and

8    "molest" and "aggressive."  He said that he was using them in a

9    joking tone when he was speaking with Minor Victim 1.

10   Q.   And did Minor Victim 1 ever indicate that she felt

11   threatened by Mr. Harris?

12   A.   I think the words she used was she had to do something

13   that she didn't want to do.  I don't know that she used the word

14   "threatened" but she did say that she had to do something she

15   didn't want to do.

16   Q.   Did she say that she communicated that to Mr. Harris?

17   A.   As you referenced earlier, she said no.  As far as any

18   other indication she gave him, I would have to review her

19   interview before I could answer that fully.

20   Q.   The only instance in which she stated no to him on some

21   aspect of their interaction, he desisted from that behavior?

22   A.   That's correct.

23        MR. REDDOCK:  That's all I have, Your Honor.

24        THE COURT:  Any redirect?

25        MS. GROOVER:  No, Your Honor.  Thank you.

1          THE COURT:  You may step down.

2          Mr. Reddock and Mr. Harris, reapproach.

3          Mr. Harris, do you dispute any of the testimony given by

4   the special agent in your case this morning?

5          THE DEFENDANT:  No.

6          THE COURT:  Do you admit the truth of her testimony?

7          THE DEFENDANT:  I didn't threaten nobody, but just some

8   count I didn't.

9          THE COURT:  All right, so you would -- it's your belief

10  that you did not threaten any of the victims?

11         THE DEFENDANT:  I didn't threaten anybody.

12         THE COURT:  Aside from that disagreement, do you dispute

13  any of the other testimony of the special agent?

14         THE DEFENDANT:  No, ma'am.

15         THE COURT:  All right, based on the record made at this

16  proceeding, I'm satisfied there's a factual basis for a plea of

17  guilty to Count 1.  Let it be entered.

18         THE CLERK:  Plea of guilty has been entered, Your Honor.

19         THE COURT:  The plea of guilty is accepted and I now

20  adjudge you guilty of Count 1 of the indictment.  The probation

21  officer will conduct a presentence investigation.  They will

22  issue a report and disclose that report to the Defense and to

23  the Government and will thereafter schedule your sentencing

24  hearing.  Mr. Harris, I will remand you back to the custody of

25  the US Marshal, and counsel, we will be in recess.

36

1          MR. REDDOCK:  Thank you, Your Honor.

2          (Proceeding concluded at 11:14 a.m.)

3                       CERTIFICATION

4

5     I certify that the foregoing is a true and correct

6  transcript of the stenographic record of the above-mentioned

7  matter.

8

9

11  _____        08/20/2023

12  Debra Gilbert, Court Reporter          Date

13

14

15

16

17

18

19

20

21

22

23

24

25