1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                     BRUNSWICK DIVISION


 3
     UNITED STATES OF AMERICA            )
 4                                       )
          vs.                            )
 5                                       )        CASE NO.
     MICHAEL IRVING SELLEY,              )   2:15-CR-0001-LGW-RSB-1
 6                                       )
              Defendant.                 )
 7   _____    )

 8

 9

10                      SENTENCING HEARING
            BEFORE THE HONORABLE LISA GODBEY WOOD
11               June 25, 2015; 10:00 a.m.
                   Brunswick, Georgia
12   APPEARANCES:

13   For the Government:      T. SHANE MAYES, Esq.
                             U. S. Attorney's Office - Savannah
14                           P. O. Box 8970
                             Savannah, Georgia  31412
15                           (912) 201-2567
                             shane.mayes@usdoj.gov

16   For the Defendant:       JAMES B. SMITH, Esq.
                             James B. Smith, Attorney at Law
17                           15618 U. S. Highway 17
                             Townsend, Georgia  31331
18                           (912) 832-2395
                             cristin@jbsmithlawfirm.com
19

20   Reported by:            Debbie Gilbert, CCR
                             Official Court Reporter
21                           801 Gloucester Street
                             Post Office Box 1894
22                           Brunswick, GA 31521-1894
                             (912) 262-2608 or (912) 266-6006
23                           debra_gilbert@gas.uscourts.gov

24

25                            - - -
```

2

P R O C E E D I N G S

(Call to order at 10:00 a.m.)

1

2

3      THE COURT:  Good morning.

4      SPEAKERS:  Good morning.

5      THE COURT:  Ms. Slater, call the first case.

6      THE CLERK:  United States of America versus Michael

7 Irving Selley.

8      MR. MAYES:  Government is ready.

9      MR. SMITH:  Good morning, Judge.  We are ready.

10      THE COURT:  Counsel, if you will approach with your

11 client, Mr. Selley.

12      Mr. Selley, you appeared before me on April 28th, 2015

13 accompanied by your attorney, Mr. James Smith, for your Rule 11

14 proceeding.

15      Pursuant to a plea agreement, you pled guilty and were

16 adjudged guilty of Count 6 of the indictment charging you with

17 possession of child pornography in violation of 18 USC Section

18 2252A(a)(5)(b).

19      Now, at the end of that Rule 11 proceeding and my

20 acceptance of your plea of guilty, I directed the probation

21 officer to prepare a presentence report and to disclose that

22 report to the Defense and to the Government.

23      Now, Mr. Selley, have you had an opportunity to read and

24 review that report and its addendum and discuss it with your

25 attorney?

3

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  And are there any objections which remain

3     either to the factual statements contained in that report or to

4     the probation officer's application of the advisory guidelines?

5          MR. SMITH:  No, Your Honor.

6          THE COURT:  And on behalf of the Government, Mr. Mayes?

7          MR. MAYES:  No, Your Honor.

8          THE COURT:  There being no objections to the factual

9     statements contained in that report, I will adopt those as my

10    findings of fact, and there being no objection to the probation

11    officer's conclusions regarding application of the advisory

12    guidelines, I will adopt those as my conclusions and, therefore,

13    find in Mr. Selley's case there's a total offense level of 30, a

14    criminal history category of 1.

15         The advisory guideline range is 97 to 121 months

16    imprisonment, five years to life of supervised release,

17    $15,000.00 to $150,000.00 fine, $1,000.00 in restitution and a

18    $100.00 special assessment.

19         Now, as far as the statute goes for Count 6, there is no

20    minimum term of imprisonment and there's a maximum of 20 years

21    in prison.

22         Now, Mr. Smith, before I turn to the Government and then

23    ultimately to Mr. Selley himself are there any documents you'd

24    like to introduce, any witnesses you'd like to call or argument

25    you'd like to make in mitigation, and let me state for the

4

1   record I did have the opportunity to read and consider the

2   sentencing memorandum that you filed on behalf of the Defendant,

3   and so I was able to look through that and consider it in

4   preparation for today's hearing, but now is the time for

5   anything else you'd like to present or argue in mitigation.

6          MR. SMITH:   Judge, we do not have any witnesses.   I

7   would just like to make a couple of points for the record,

8   though.

9          First of all, in regards to Mr. Selley, we would ask The

10  Court to take into consideration -- these facts I do believe are

11  for the most part recited in the presentencing report, but we

12  would ask The Court to consider that he does have a family.

13  They are all present here in courtroom today, including his two

14  teenage children, one who is currently in college.   The family

15  loves him very much as he does them, and they are in need of his

16  love and support.

17         We would also ask The Court to take into consideration

18  particular health issues Mr. Selley has, particularly his heart

19  issue that's documented in the sentencing reports, numerous neck

20  and back issues.   I believe we filed as a -- along with our

21  memorandum several -- and we don't have any medical expert to

22  testify, but I think we all know, you know, can read those

23  images and certain bulging disks, broken screws, those things, I

24  mean, we all can agree those are serious and likely will have a,

25  you know, some substantial corrective procedures to fix those

5

1    issues.

2          So again we would ask The Court to take those factors in

3    mind.  He's also -- he will be 42 years old in July of this

4    year.  There again, as cited in our sentencing memorandum,

5    generally speaking, age tends -- the chance of him reoffending

6    or anything of that nature tends to go down with age, so we

7    would ask The Court to take that in consideration.

8          Two other matters, Your Honor.  First of all, Mr. Selley

9    has cooperated from the git-go in this case.  At the search

10   warrant stage, he was not under arrest, obviously was not in the

11   presence of counsel.  He agreed to sit down with agents, and he

12   came completely clean, not only as to what he had been doing but

13   where they could find the stuff in his home, the timeframe that

14   he had done these things.  I mean, he completely spilled the

15   beans, and, you know, has never tried to mislead or pass the

16   buck.  You know, there were other people in the household.  He

17   might could have -- you know, he took full responsibility for

18   his actions from the git-go, so we would ask The Court to

19   consider that.

20         Also, too, Mr. Selley has no criminal history,

21   absolutely none, zero, certainly no criminal history in regards

22   to any other offenses of this nature, whether hands-on or

23   viewing image -- whatever it may be, nothing else.

24         To my knowledge, no allegations have ever surfaced of

25   him being a hands-on offender or anything of that nature, so

6

1    again we would ask The Court to take that into consideration.

2         Your Honor, in regards to the guidelines range, in our

3    memorandum we ask that The Court would deviate downward, and,

4    you know, the memorandum is basically, as The Court is aware

5    now, after reviewing it, is several -- probably common

6    criticisms we hear regarding the 2G2.2 enhancements.  You know,

7    I think in this case, I would like to point out a couple.

8         Well, first of all, let me back up.  You know, this

9    Court as you are well aware or know, you can deviate downward

10   from the guidelines, if you find, based off the totality of the

11   circumstances there's a reasonable basis for doing so, and that

12   decision will not be disturbed on appellate review absent a

13   clear abuse of discretion, so it's within The Court's power to

14   deviate downward.  Obviously, we're asking The Court to do that.

15        Now, in regards to the enhancements, the 2G2.2

16   enhancements that apply to Mr. Selley's case, particularly the

17   distribution enhancement, Your Honor, and I think Detective

18   Woodall is going to give us a little more insight, but my

19   understanding of the site where these images came from is what

20   would be classified as peer-to-peer viewing network.

21        I mean, my knowledge of Mr. Selley's -- and he may

22   mention more about this, but his technological prowess in

23   regards to a computer pretty much, I would think, extends to

24   clicking a mouse and downloading whatever it may be, and I don't

25   think he's ever said that he or admitted that he knew or ever

7

1   claimed that he knew that others were in turn downloading from

2   him, you know, so it was -- I think it's just the nature or that

3   site more so than Mr. Selley ever intending to distribute this

4   material.

5           Also, Your Honor, this offense involving a computer, I

6   mean, is that really an enhancement?  I mean, it's a -- to me,

7   it sounds like the nature -- I mean, this is -- this is where

8   people go to do this in our day and time.  I mean, it's not --

9   you know, it's not that the computers and especially or going to

10  computers is any more deviant or any more, you know, heinous

11  than anything else.  It's just -- that's the preferred method of

12  acquiring this stuff, and I mean, it's -- I don't see how it can

13  be treated as an enhancement.

14          Those are the two we have the most issue with, Your

15  Honor, and again, we -- based off all these factors, Mr. Selley

16  would ask that you deviate downward and get him back to his

17  family, get him back to his life.

18          Also, you know, Your Honor, if it would -- you know, he

19  requests, if necessary, lifetime supervision and whatever

20  conditions that would come along with that with probation,

21  counseling, monitoring, I mean, if we can do it, polygraphs, if

22  necessary, you know, anything to get back home and get back to

23  his family.  That's what he's requesting of this Court today.

24          THE COURT:  And Mr. Smith, did you have any witnesses

25  you'd like to call?

8

1          MR. SMITH:  No, ma'am, we do not.

2          THE COURT:  If you two will have a seat.  Mr. Mayes, on

3     behalf of the Government, first, let me ask you, Mr. Mayes, are

4     there any witnesses, are there any victims that would like to be

5     heard at this time?

6          I did receive, as did the Defendant, a copy of the

7     letter that's submitted on behalf of the victim in the Vicky

8     Series as well as a supplement to that letter, and I also

9     received a second victim letter detailing the ways in which this

10    crime has altered that person's life, and finally a third victim

11    impact statement from one of the parents of one of the young

12    children who was depicted.

13         MR. MAYES:  Your Honor, beyond those, as far as victims,

14    I'm not aware of any victims that have expressed an interest in

15    being heard further.  The Government does have Detective

16    Woodall, which we would like to put on the stand for testimony

17    today and then make argument.

18         THE COURT:  Proceed.

19                    DETECTIVE CHARLES WOODALL,

20    having been first duly sworn, was examined and testified as

21    follows:

22         THE CLERK:  You may be seated.  Please state your full

23    name, spell your last, state your business address and

24    occupation for the record.

25         THE WITNESS:  My name is Charles Woodall, W-o-o-d-a-l-l.

9

1   I currently work for the Federal Bureau of Investigation in

2   Savannah, Georgia.  We just moved so I don't have the new office

3   address.

4                           DIRECT EXAMINATION

5   BY MR. MAYES:

6   Q.   Detective Woodall, are you, in fact, part of a task force

7   that works in connection with the FBI and Liberty County

8   Sheriff's Office and other agencies to combat child exploitation

9   and other child sex crimes?

10  A.   That's correct, sir.

11  Q.   Detective Woodall, I want to cover three areas with you

12  this morning very briefly.

13       Number One, I want to talk about the Shareaza file-sharing

14  program.  Number Two, I want to talk about your training and

15  experience, your impression of Mr. Selley's frequency of use and

16  possession as compared to others, and lastly, I want to talk to

17  you about Mr. Selley's interaction with law enforcement in this

18  matter.

19       First, turning to the Shareaza file program, first of all,

20  give The Court a little bit of overview of your background into

21  this type of work?

22  A.   I have been a computer examiner for the better part of 40

23  years.  Prior to the Internet, I got involved in computers and

24  training and processing computers at that time.  It was just --

25  we processed computers independently.

1    In the early eighties, late seventies, early eighties when

2 the Internet came on board, came online, I began to evolve into

3 that.  I was trained in that.  I have received training from

4 various federal agencies.  I've worked for various state

5 agencies over the years, most predominantly North Carolina,

6 South Carolina, Georgia, Florida, and I have received training

7 from each of those.

8    I've also attended all the federal schools that are

9 available for computer forensics and computer examination.  I'm

10 a certified forensic examiner in that I can take a computer,

11 look at the hard drive and extract data from it in a

12 forensically sound procedure to prove or disprove an offense or

13 information.

14 Q.   Detective Woodall, how many child pornography cases have

15 you investigated during your career?

16 A.   Sir, I couldn't begin to guess.  There's hundreds and

17 hundreds of them.

18 Q.   In your career, have you become familiar with the program

19 called Shareaza?

20 A.   Yes, sir.

21 Q.   Can you tell The Court what that is, how you get it and

22 how it works?

23 A.   Within the Internet, there's an area called file-sharing.

24 It's a -- there's a variety of different networks.  This

25 particular network is called Gnutella, G-n-u-t-e-l-l-a.  That's

11

1    one network within the file-sharing community.  Shareaza is a

2    computer program that was written and produced to allow people

3    to share files on the Gnutella network.  It's a freely available

4    file that you can download from the Internet.  You install it on

5    your computer and you go through a series of screens to set it

6    up.

7    Q.   Let's talk about when you are setting it up.  What types

8    of information are provided to the person that is setting it up?

9    A.   When you click on the program to install it, it allows you

10   to determine what files you will be sharing.  It lets you add

11   directories.  You can add external drives.  You have a lot of

12   control over what you share.  The program starts off with

13   telling you that you are going to be sharing files; be careful

14   what you share.  It reminds you about copyright laws and not

15   sharing copyrighted programs.

16        There's a variety of legal procedures that it goes through

17   and alerts the user that you can potentially become the victim

18   of identity fraud if you share such things as your identity, but

19   once you -- if you accept all the defaults, you have to manually

20   click it and say, "Yes, I accept it, yes, I accept it, yes, I

21   accept it."

22   Q.   So when you become a member of the Shareaza community, so

23   to speak, you agree to share information that is in your -- on

24   your drives; is that correct?

25   A.   That's correct.

1  Q.    And to be clear, Shareaza is the program that was used by

2  Mr. Selley?

3  A.    That's correct.

4  Q.    And you participated in this investigation?

5  A.    Yes, sir.

6  Q.    Now moving forward in the Shareaza program, once you

7  download it, how does it work and how you share programs and

8  let's be clear.  Let's talk at the child pornography community.

9  A.    That is predominantly what Shareaza is used for.  In order

10  to find a program on the file-sharing network, you have to go in

11  an insert a search term.  You pick a search term that -- it will

12  get back files that meet your interests.  For example, PTHC is

13  an acronym used in the child pornography community.  It stands

14  for preteen hard core.

15      Someone outside the child exploitation community probably

16  wouldn't understand that, but you insert search for PTHC.  It

17  will go out through the Shareaza Gnutella network and query all

18  the computers that are online at that time and say, "Do you have

19  any file that meets this criteria?"  It returns that list of

20  files back to the person making the query, in this case, Mr.

21  Selley.  Then he clicks on the files that he wants to obtain.

22  It will give him the title of it and what he's going be

23  downloading and then he will download it to his computer.

24  Q.    Let's talk about people that are getting information or

25  files from, in this instance, Mr. Selley, which would include

1   yourself because, according to the PSR, Liberty County Sheriff's

2   Office did obtain files from his drive on Shareaza?

3   A.    Correct.

4   Q.    How does that work?

5   A.    We also run the same software.  We've had it modified so

6   that even though it appears that we're sharing we're not.  The

7   whole concept of file-sharing is you have to share to get

8   something.  If you don't share files, then people will block

9   you.  They won't let you get from them.

10          So what we do in law enforcement, we have a specialized

11   version that's written by us, by law enforcement, that says that

12   we're sharing files but they just can never get anything from

13   us.

14   Q.    But the point is -- and I'm not talking specifically about

15   what law enforcement does.

16   A.    Okay.

17   Q.    Another person who is seeking child pornography is able to

18   go onto Mr. Selley's file and obtain child pornography?

19   A.    And that's in essence what we do.  We enter a key search

20   term.  We enter PTHC, five-year-old, three-year-old, whatever

21   we're looking for.  We, in turn, get those results back and Mr.

22   Selley's IP address, his Internet protocol address, was returned

23   as one of the people that was offering those files.

24   Q.    And when that happens, when someone searches for items and

25   they find them in Mr. Selley's file, how does the distribution

14

1 process work and what information is given to Mr. Selley when

2 someone is obtaining files from his hard drive or his computer?

3 A.    I would then click on the file, initiate my download from

4 Mr. Selley.  On Mr. Selley's end, it will come up on the bottom

5 screen on Shareaza saying you have three people getting files

6 from you and you're in the process of downloading, so it keeps

7 of running total of what's going on at all times.

8       It's a small window at the bottom of the computer.  If he

9 is sitting in front of the computer at that specific minute or

10 during my downloading, he will see that -- that notification.

11      Oftentimes, people will start downloads and they will walk

12 away because the download process is slow so...

13 Q.    And to be clear, Mr. Selley told you and Agent Kirkconnell

14 that he had downloaded the sum of 800 to 1,000 videos during the

15 course of 12 to 18 months; is that correct?

16 A.    That's correct.

17 Q.    Now let's turn to the second area, which is your

18 impression of that level of frequency based on your training and

19 experience as compared to others.

20 A.    Mr. Selley is not a casual downloader.  He is not a casual

21 viewer of child pornography.  He would be higher in the

22 frequency list, simply because of the number of files that he

23 was sharing and downloading.

24 Q.    If someone -- for lack of a better term -- was a casual

25 viewer -- and I know there's not a such thing as a casual

1  viewer, to be clear -- but someone on the lesser end, how often

2  would you -- what would their frequency level be?

3  A.    Ten or less in any given period.  Usually over a 30-day

4  period, if we see a person downloading one a day for 30 days,

5  he's getting -- he's starting to get out of the casual user but

6  he's still pretty low on the overall threshold.

7  Q.    Lastly, I want to talk to you about law enforcement's

8  interaction with Mr. Selley on the day he was arrested and going

9  forward.

10  A.    We announced ourselves at his door.  Mr. Selley was very

11  cordial, very forthcoming and open, as his counsel pointed out.

12  He voluntarily sat and talked to us.  He told us what computers

13  he was using to download the child pornography and told us where

14  we would find it at.  He told us how much he had downloaded, and

15  everything he told us was pretty much accurate.

16  Q.    Let me ask you about something.  Let me ask you this:

17  During those conversations, did he ever tell you that one of the

18  reasons he was looking at child pornography was because he

19  wanted to see if he could find himself in some of the videos?

20  A.    No, sir.

21        MR. MAYES:  Your Honor, no further questions at this

22  time.

23        THE COURT:  Detective, before we turn to defense counsel

24  for cross-examination, let me go ahead and address some

25  questions to you.

16

1          As Mr. Mayes just mentioned, one of the contentions that

2     Mr. Selley has made is that he himself long ago was the victim

3     of abusive behavior.

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:  And he says that part of the reasons he has

6     what is the equivalent of 14,000 images of disturbing child

7     pornography is that he was actually simply just looking to see

8     if he could find himself and then perhaps initiate some homespun

9     way of addressing who he believes is the ultimate perpetrator of

10    all of this.

11         Is there any way through computer forensics that you can

12    tell how long someone viewed a particular image?

13         THE WITNESS:  Yes, ma'am.

14         THE COURT:  So, for example, one of the 14,000 images

15    involved in this case is a two- or three-year-old little girl

16    getting raped by a male for a long time.

17         Is there any way to tell whether somebody just clicked

18    on it and saw the man and the little girl and realized "That's

19    not me" and so looked elsewhere or whether they watched minute

20    after minute after minute after minute of this little child

21    being raped by a grown man?

22         THE WITNESS:  You can -- we can tell forensically that

23    the entire video was watched.  To what extent, was he paying

24    close attention, did he watch it more than once, sometimes you

25    can, sometimes you can't.  It just depends on how much he's used

1    that computer, what he's done since then.

2         Every video that -- that I fully described -- I'm trying

3    to think of a good way to put this, Your Honor.  Mr. Selley was

4    deleting files from his computer.  So when he -- he could have

5    been viewing some and deleting them.  They may not have met his

6    interest.  There's a variety of different reasons.  I can't get

7    inside of his head and say why he deleted and why he watched

8    them and I'm not going to try to do that.

9         THE COURT:  Nor am I asking.

10        THE WITNESS:  I understand that.

11        THE COURT:  So for now if you will direct your attention

12   to my actual question and answer it, and then there may be other

13   things that you want to tell me.

14        THE WITNESS:  Yes, ma'am, I can tell you that the videos

15   were watched in their entirety, some of them, not all of them.

16        THE COURT:  Thank you, sir.

17        Mr. Smith, cross-examination.

18                          CROSS-EXAMINATION

19   BY MR. SMITH:

20   Q.   Just briefly, Your Honor.  You said that some of the

21   videos were watched in their entirety; is that correct?

22   A.   Yes, sir, that's correct?

23   Q.   Approximately how many, do we know?

24   A.   I never went to that extent in the examination, sir.

25   Q.   So we obviously don't know how many were not watched in

1   their entirety?

2   A.    Absolutely, that's correct.

3   Q.    What was the number of videos that you were able to

4   recover from -- do you recall?

5   A.    150, 155, somewhere in there, that we actually took off of

6   the one drive.

7   Q.    And just so I'm clear, the titles that are in the -- that

8   we've listed, that are listed in the presentencing report are

9   the ones that you say were watched in their entirety?

10  A.    I haven't seen the presentence report.

11        MR. MAYES:  Your Honor, I was going to say he hasn't

12  seen the presentence report.

13  Q.    (By Mr. Smith)  But we do not know which ones were watched

14   in their entirety?

15  A.    The ones that I fully describe are watched in their

16  entirety.

17        MR. SMITH:  Nothing further, Judge.

18        THE COURT:  I want to make sure we're on the same page

19  because he's using the identifier of "the ones I fully describe"

20  and then we've got access to the presentence report.

21        The descriptions I have in the presentence report and

22  the Defendant has, there's a video of two male children

23  performing oral sex on each other that's 21 minutes long.  There

24  is a child who's described as four-year-old who an adult male

25  has anal sex with through the course of the video.  There's an

19

1  adult male engaging in intercourse with a nine-year-old child.

2  There's an adult male with a four-year-old child who is engaging

3  in intercourse with her, an adult male engaging in anal sex with

4  a toddler-aged male, a prepubescent male, who is exhibiting

5  sexual activity.  He's about eight years old.  There's an adult

6  male engaging in intercourse with a toddler girl and an adult

7  male engaging in anal intercourse with a seven-year-old boy and

8  an adult male performing oral sex on a 11-year-old boy.

9         Those are some of the videos that are described in the

10  presentence report.  Are those some that you are referring to?

11        THE WITNESS:  Yes, ma'am.  Those are some of the videos

12  that were watched in their entirety.  I specifically checked for

13  those.

14        THE COURT:  All right.  Mr. Mayes, any other questions?

15        MR. MAYES:  That's all I have, Your Honor.

16        THE COURT:  Mr. Smith, any other questions?

17        MR. SMITH:  Nothing further, Your Honor.

18        THE COURT:  One other area --

19        MR. MAYES:  I do have argument, Your Honor.

20        THE COURT:  Yes.

21        Before you step down, there is reference to a person who

22  is now an adult who as I understand may live with Mr. Selley now

23  and images may have been found on that person's computer as

24  well, a Mr. Adam Latka.

25        It's my understanding that what you're attributing to

20

1   Mr. Selley does not involve Mr. Latka's collection; is that

2   right?

3          THE WITNESS:  No, ma'am, that's not.

4          THE COURT:  Some of that is Mr. Latka's as well?

5          THE WITNESS:  No.  Mr. Latka's collection was Mr.

6   Selley's collection.

7          THE COURT:  I see.

8          THE WITNESS:  Do you need me to explain that at all,

9   Your Honor?  I apologize.

10          THE COURT:  Anything you want to add.

11          THE WITNESS:  Well, again, Mr. Selley was very up front.

12   He had given those files to his roommate and put them on a hard

13   drive and gave them to Mr. Latka.  Mr. Latka, in turn,

14   reassembled and them, renamed some of the folders and put them

15   in his own structure, but Mr. Selley acknowledged he was the one

16   who had produced -- had actually transferred those over there.

17          THE COURT:  And Mr. Latka is how old now?

18          THE WITNESS:  He's an adult.

19          THE COURT:  Any followup, Mr. Mayes?

20                    REDIRECT EXAMINATION

21   BY MR. MAYES:

22   Q.   To be clear, that area that the judge just discussed is a

23   separate ongoing investigation?

24   A.   That's correct.

25   Q.   Is that correct?

1       THE COURT:  I see.

2       Mr. Smith, any --

3       MR. SMITH:  No, ma'am, nothing further, Judge.

4       THE COURT:  Mr. Mayes, argument?

5       You may step down, Detective.  Thank you.

6       And let me also state for the record that I did receive

7  several letters on behalf of the Defendant from his family and

8  Mr. Latka himself, and I did have the opportunity to read those

9  and consider those in preparation for the hearing.

10      MR. SMITH:  Thank you, Your Honor.

11      THE COURT:  All right Mr. Mayes.

12      MR. MAYES:  Your Honor, a guideline sentence is

13 appropriate in this case.  As The Court is well aware, this is

14 not a victimless crime.  I was prepared to go through each of

15 those videos and point out the nature of them, but we just did

16 that, so I won't be repetitive, but I will remind The Court,

17 these are not just images and videos.  These are real people,

18 real victims.  They depict violence against children, the most

19 vulnerable members of our community, and it's not just a video

20 and it's not just something that happens that somebody watches

21 at home and there is no harm.

22      I would like to read just the first two paragraphs of a

23 real example of what's before The Court in the Vicky Series of

24 the impact statement of this particular victim just so we're all

25 on the same page as to this is not just something that happened

1   and I watched it at my house a couple hundred miles away.

2        "I live every day with the horrible knowledge that many

3   people somewhere are watching the most terrifying moments of my

4   life and taking grotesque pleasure in them.  I'm a victim of the

5   worst kind of exploitation, child porn.  Unlike other forms of

6   exploitation, this one is never-ending.  Every day people are

7   trading and sharing videos of me as a little girl being raped in

8   the most sadistic ways.  They don't know me but they have seen

9   me -- they have seen every part of me.  They are being

10  entertained by my shame and pain.  My world came crashing down

11  the day I learned that pictures of me being sexually abused had

12  been circulated on the Internet.  Since then, little has changed

13  except my understanding that the distribution of these pictures

14  grows bigger and bigger by the day and there is nothing I can do

15  about it.  The enormity of this has added to my grief and pain

16  and given me a paranoia.  I wonder if the people I know have

17  seen these images.  I wonder if the men I pass in the grocery

18  store have seen them.  I feel totally out of control.  They are

19  trading around my trauma like treats at a party and it feels

20  like I am being raped all over again by every one of them.  It

21  sickens me to my core, terrifies and makes me want to cry.  So

22  many nights I've cried myself to sleep thinking of a stranger

23  somewhere staring at their computer with images of a naked me on

24  the screen.  I have nightmares about it often.  I can never feel

25  safe so long as my images are out there.  Every time they are

1    downloaded I am exploited again.  My privacy is breached and I

2    feel in danger again.  I fear that any of them may try to find

3    me and do something to me."

4         And that's a real victim and one of the victims in this

5    case, Your Honor.

6         The Government, I've had the opportunity to review Mr.

7    Selley's sentencing memorandum.  I think you can break it down

8    into two essential components.  Number 1, "I'm not as culpable

9    as I appear to be," and secondly, a sentence below the

10   guidelines is appropriate.  Those arguments kind of go hand in

11   hand.  If it was a civil case, I would say he is arguing both

12   liability and damage.

13        As to the culpability, "I didn't know what I was doing,"

14   I think Detective Woodall's testimony makes it clear this was a

15   program widely known in the child pornography community to be

16   used in the manner in which Mr. Selley is being attributed with

17   using it in this case.  If you don't give, you don't get.  So he

18   knew that he was making these images available.

19        As to the appropriate sentence in this case, Your Honor,

20   I would note that, you know, if Mr. Selley had pled to or been

21   convicted of all the items in the indictment, we would be at a

22   very different place today.  We would be starting -- I mean, his

23   guideline recommendation would be 151 to 188 months.  The

24   guidelines today are much below that, Your Honor.

25        After consultation with the FBI, after consultation with

24

1  Detective Woodall's office and discussion internally in the US

2  Attorney's Office, Mr. Selley was presented with the plea offer

3  which he stands before The Court on today.

4      He stands before The Court today and should be sentenced

5  based on what he did and I don't think he should be given any

6  sentence below -- the Government does not think he should be

7  given a sentence below the guidelines.

8      And in imposing a sentence, Your Honor, as I always do,

9  I remind The Court, you know, he did, Mr. Selley -- you know,

10 from my vantage point, there's always a difference in the

11 formulaic acceptance of the responsibility, someone who signs a

12 plea agreement, versus someone who does what he did, which is

13 when the police officers and the FBI came to his house, he

14 voluntarily cooperated with them and I think that is an

15 additional level of acceptance of responsibility, so to speak.

16     I would take into account, ask The Court to take into

17 account Mr. Selley's personal history as noted in the PSR, the

18 items discussed by Mr. Smith and we would submit the sentence to

19 the sound discretion of The Court, Your Honor.

20     THE COURT:  Thank you, Mr. Mayes.

21     Mr. Smith and Mr. Selley, reapproach.

22     Mr. Smith, any other argument you'd like to make?

23     MR. SMITH:  No, Your Honor.  We will rest on what we've

24 presented so far.

25     THE COURT:  Well, Mr. Selley, it is your opportunity to

1    address me last.  Is there anything you'd like to say in

2    mitigation of sentence?

3            THE DEFENDANT:  I would just like to reiterate points

4    that were made earlier of what I lived through.  This is

5    something where I'm just trying to put a stop to a man that

6    brutalized me and my sister for years, and if it was taken more

7    seriously, it would have been done by law enforcement when I

8    called them several years to report it and I was told that the

9    statute of limitations had run out and that they could not do

10   anything without proof.

11           I mean, it's not just me that was brutalized.  It was

12   me, my sister, several neighborhood children, and that statement

13   is pretty well close.  You do live every day in fear of what's

14   going to happen.  I take more medication that I can count

15   because I'm scared to even go out my door.

16           I don't let my children leave my sight, and I -- because

17   of that, my -- I've raised my children where they are very good

18   people.  If I'm going to be convicted, I'd prefer to be

19   convicted of doing something wrong, not trying to make a wrong

20   right.  Mike Snyder is a nightmare.

21           I can't begin to verbalize the things that were done,

22   and I truly think that that should be taken into account.  And

23   during my interview with Detective Woodall and Agent

24   Kirkconnell, I told them right there in their car of the

25   molestation and the brutality of it.

1   THE COURT:  So you would maintain the position that

2 Detective Woodall is lying here in court when he says you did

3 not?

4   THE DEFENDANT:  Yes, ma'am, I would.

5   I can't think of anything else to say.  That's -- I'm

6 here to do what The Court wants me to do.  I'm more than willing

7 to -- I mean, I've already entered counseling through Gateway.

8 I'm more than willing to continue that counseling because I need

9 to anyway.

10   I'm more than -- more than willing to go the rest of my

11 life on supervised visitation or supervised probation, but I

12 would truly appreciate that, you know, law enforcement does

13 follow up and maybe be able to put a stop to what Mike Snyder

14 has done and is still doing.

15   THE COURT:  Anything further?

16   THE DEFENDANT:  No, ma'am.

17   THE COURT:  Well, I have studied the presentence report

18 and its brief addendum and I have read all of the victim letters

19 and have also read all of the letters and affidavits that were

20 submitted on behalf of the Defendant and have also studied the

21 sentencing memorandum that was brought forth by defense counsel

22 on behalf of the Defendant, and I want to be clear regarding the

23 reasons for the sentence that Mr. Selley has earned himself.

24   One thing that is clear is that there are a number of

25 people who were victimized.  Of course, all the three-year-old

1    and two-year-old and four-year-old and eight-year-old and

2    nine-year-old children who were raped on video and then whose

3    images were traded back and forth among people, I think Mr.

4    Selley in a personal way understands that tragedy and how every

5    person that plays a part in reliving those horrific moments is a

6    perpetrator and is prolonging unimaginable pain and shame.

7           I understand that Mr. Selley has himself been a victim

8    of that type of abuse and Mr. Selley's family who is here is

9    certainly suffering from what has been done, beyond question.

10          Having considered all of the factors that are set forth

11   in our federal sentencing statute, 18 USC Section 3553, I find

12   absolutely no reason to depart or vary from the sentence called

13   for by application of the sentencing guidelines.

14          Mr. Selley individually elected to view thousands of

15   images and I understand the words that he is saying, that the

16   law enforcement officer lied on the stand and that all he was

17   doing in watching these horrific videos, some of them to the

18   very last second, was trying to catch a man who hurt him.

19          I want to be clear that I don't believe you.  I'm not

20   adding to your sentence because of your claim here in court

21   today.  I'm sentencing you, rather, because of what you've done

22   and what you've done to other people.  You've earned a guideline

23   sentence.

24          You're hereby committed to the custody of the Bureau of

25   Prisons to be in prison for a term of 97 months.  As you will

28

1   notice, I did pick a point that is at the low end of the

2   guidelines and I do so because of your attorney's argument that

3   is well placed that the sentence enhancement for use of a

4   computer is really in this day and age an antiquated enhancement

5   and that almost every crime of this nature these days does

6   involve a computer and doesn't deserve the enhancement.

7          But make no mistake.  You've earned that sentence.  And

8   it took you a long time to earn that sentence.  There was a lot

9   of images and a lot of pain that you watched until the very end.

10          I also want to make clear that there was a mention of

11   perhaps an ongoing investigation with regard to Mr. Latka.  The

12   letter submitted and the presentence report indicates that your

13   romantic relationship with him did not begin until his 18th

14   birthday although you've known him well since he was ten, and my

15   sentence accepts your contention in that regard completely, and

16   no part of your sentence is in any way based on any impropriety

17   with Mr. Latka.

18          I do recommend to the Bureau of Prisons that he be

19   evaluated for possible inclusion in a substance abuse treatment

20   program that may be available.

21          Restitution is due in the amount that I understand

22   counsel have agreed upon and that's $1,000.00; is that correct,

23   Mr. Smith?

24          MR. SMITH:  Yes, ma'am.

25          THE COURT:  Is that correct, Mr. Mayes?

1       MR. MAYES:  Yes, Your Honor.  I spoke with Mr. Smith

2    again before today's proceeding began and I understand that he's

3    going to have that check mailed out by the close of business.

4       MR. SMITH:  That's correct, Your Honor.  The family is

5    going to get it together and hopefully by the close of business

6    today.

7       THE COURT:  And that thousand dollars is due to the

8    victim depicted in the child pornography video series that's

9    known as the Vicky Series.

10       MR. MAYES:  That's correct, Your Honor.

11       MR. SMITH:  Yes, ma'am.

12       THE COURT:  After considering the guideline factors with

13    regard to the payment of a fine, I find that he does not have

14    the ability to pay a fine and won't order one.  There is a

15    $100.00 special assessment which is due immediately.

16       Upon release from imprisonment, he will on supervised

17    release for a term of life.  While on supervised release, he

18    will need to comply with the standard and mandatory conditions

19    that are required by The Court and federal law, including

20    collection of a DNA sample and participation in a program of

21    testing for drug and alcohol abuse.

22       He will be subject to certain searches and will be

23    required to attend and participate in a mental health treatment

24    program, including sex offender treatment, and abide by all the

25    rules that are associated with that.

1    He will not possess or access any pornography involving

2    adults or children and not have contact with anyone under the

3    age of 18 unless accompanied by a responsible adult who is aware

4    of his current offense and background.

5        He shall not possess a computer with online access

6    without the approval of the probation officer.  He is, of

7    course, required to register as a sex offender with federal,

8    state and local authorities.

9        I did accept the plea agreement, and as perhaps both

10   counsel have pointed out, the plea agreement enabled the

11   Defendant to plead guilty in such a way that he avoided what

12   would have been a much longer even advisory guidelines sentence.

13       Pursuant to that plea agreement, I now order that Counts

14   1, 2, 3, 4, and 5 of the indictment be dismissed as it relates

15   to Mr. Selley.

16       Further pursuant to that plea agreement, he did waive

17   with limited exceptions his appellate rights and his right to

18   attack the sentence in any postconviction proceeding.

19       Now, Mr. Smith, you have been furnished with your notice

20   of postconviction obligations to your client and if you will

21   sign that, have Mr. Selley sign it and file that with the clerk.

22       MR. SMITH:  Yes, ma'am.

23       THE COURT:  Do you have a request as to which facility

24   he be placed in?

25       MR. SMITH:  He would wish to go to Jesup, Your Honor.

1      THE COURT:  To the extent space and security can

2   accommodate that request, I do make that recommendation to the

3   Bureau of Prisons, that he be placed in the Jesup FCI so as to

4   be close to his family, who is here in Georgia.

5      Well, it is a tragic case all the way around.  Sentence

6   has now been pronounced.  Do you now have any objections to my

7   findings of fact, my conclusions of law or to the manner in

8   which sentence was pronounced?  Mr. Smith?

9      MR. SMITH:  No, Your Honor.

10      THE COURT:  Mr. Mayes?

11      MR. MAYES:  No, Your Honor.

12      THE COURT:  Mr. Selley, I will remand you to the custody

13   of the US Marshal, and Mr. Smith and Mr. Mayes, you may be

14   excused.  We will be in recess until 11 o'clock for our next

15   case.

16                          CERTIFICATION

17

18      I certify that the foregoing is a true and correct

19   transcript of the stenographic record of the above-mentioned

20   matter.

21

22      *Debra D Gilbert*

24   _____      07/16/2016

25   Debra Gilbert, Court Reporter          Date